AO 106 (Rev. 04/10) Application for a Search Warrant

FILED

AUG 29 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Silver Apple iPhone Cellular Phone
IMEI # 352016073779142
Model # A1549

)
)
)
)
)
)

Case No. **19MJ3681**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841, 846, 952, 960, 963 | Possession with intent to distribute controlled substance; Importation of a Controlled Substance; Conspiracy to commit same |

The application is based on these facts:

See attached Affidavit of DEA Task Force Officer Ian Crawford

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ian Crawford, DEA Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/29/2019

_____
*Judge's signature*

City and state: San Diego, California

Hon. Andrew G. Schopler, United States Magistrate Judge
*Printed name and title*

## **ATTACHMENT A-2**

### PROPERTY TO BE SEARCHED

The following property is to be searched in connection with an investigation of violations of Title 21, United States Code, Sections 841(a), and 846, Distribution and Possession with the Intent to Distribute Controlled Substances and Conspiracy to the do same, and Title 21, United States Code, Sections 952, 960, and 963, Unlawful Importation of a Controlled Substance and Conspiracy to do the same:

> Silver Apple iPhone Cellular Phone
> IMEI # 352016073779142
> Model # A1549
> **(Target Device 2)**

**Target Device 2** is currently in the possession of the Drug Enforcement Administration, as evidence and being held in an evidence locker located at 4560 Viewridge Avenue, San Diego, California.

## ATTACHMENT B-2

Authorization to search **Target Device 2**, described in Attachment A-2, includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in **Target Device 2** for evidence described below. The seizure and search of **Target Device 2** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of December 1, 2018 to August 7, 2019:

a.   tending to indicate efforts to import methamphetamine, fentanyl, or other federally controlled substances from Mexico into the United States, and to distribute methamphetamine, fentanyl, or other federally controlled substances within the United States;

b.   tending to identify accounts, facilities, storage devices, and/or services such as email addresses, IP addresses, and phone numbers used to facilitate the importation of methamphetamine, fentanyl, or other federally controlled substances from Mexico into the United States, and the distribution of methamphetamine, fentanyl, or other federally controlled substances within the United States;

c.   tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, fentanyl, or other federally controlled substances from Mexico into the United States, and the distribution of methamphetamine, fentanyl, or other federally controlled substances within the United States;

d.   tending to identify travel to or presence at locations involved in the importation of methamphetamine, fentanyl, or other federally controlled substances from Mexico into the United States, and the distribution of methamphetamine, fentanyl, or other federally controlled substances within the United States;

e.   tending to identify the user of, or persons with control over or access to, **Target Device 2**; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 841(a), and 846, Distribution and Possession with the Intent to Distribute Controlled Substances and Conspiracy to the do same, and Title 21, United States Code, Sections 952, 960, and 963, Unlawful Importation of a Controlled Substance and Conspiracy to do the same.

1
2
3
4
5
6
7

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

IN THE MATTER OF THE SEARCH OF

White Samsung Cellular Phone
IMEI # 352247/10/503580/3
Serial # R28M20LQWVJ

Silver Apple iPhone Cellular Phone
IMEI # 352016073779142
Model # A1549

**AFFIDAVIT OF TASK FORCE OFFICER IAN CRAWFORD  IN SUPPORT OF A SEARCH WARRANT**

I, Task Force Officer I. Crawford, having been duly sworn, declare and state as follows:

**I**

## INTRODUCTION

1.     I make this affidavit in support of an application for a warrant to search the following electronic devices:

White Samsung Cellular Phone
IMEI # 352247/10/503580/3
Serial # R28M20LQWVJ
(Target Device 1)

Silver Apple iPhone Cellular Phone
IMEI # 352016073779142
Model # A1549
(Target Device 2)
(collectively the Target Devices)

and seize evidence of crimes, specifically violations Title 21, United States Code, Sections 841(a), and 846, Distribution and Possession with the Intent to Distribute Controlled

1  Substances and Conspiracy to the do same, and Title 21, United States Code, Sections 952,

2  960, and 963, Unlawful Importation of a Controlled Substance and Conspiracy to do the

3  same (the Target Offenses).

4        2.     Target Device 1 was seized from Defendant Efren Wilson ONTIVEROS at

5  the time of his arrest for Possession of Fentanyl with the Intent to Distribute on August 7,

6  2019, at the MTS Trolley Station located at 688 Palm Avenue, San Ysidro, California.

7  Target Device 1 was found on ONTIVEROS' possession at the time of his arrest. Target

8  Device 1 is currently stored in a DEA evidence storage vault located at 4560 Viewridge

9  Avenue, San Diego, California.

10        3.     Target Device 2 was seized from uncharged defendant No. 1 (UD1) at the

11  time of her arrest for possession of Fentanyl with the Intent to Distribute, and

12  Transportation of Fentanyl, on August 7, 2019, at 1881 Palm Avenue, San Diego,

13  California. Target Device 2 was seized from UD1's vehicle which is registered to her and

14  she was observed driving on August 7, 2019. Target Device 2 is currently stored in a DEA

15  evidence storage vault located at 4560 Viewridge Avenue, San Diego, California.

16        4.     The search of the Target Devices supports an investigation and prosecution of

17  ONTIVEROS and UD1 for the Target Offenses. Based on the information below, there is

18  probable cause to believe that a search of the Target Devices, as described in Attachments

19  A-1 and A-2 will produce evidence of the Target Offenses, as described in Attachments B-

20  1 and B-2.

21        5.     The following is based upon my experience and training, investigation, and

22  consultation with other law enforcement agents and officers experienced in narcotics

23  violations, including the Target Offense. The evidence and information contained herein

24  was developed from interviews and my review of documents and evidence related to this

25  case. Because I make this affidavit for the limited purpose of obtaining a search warrant

26  for the Target Devices, it does not contain all of the information known by me or other

27  federal agents regarding this investigation, but only sets forth those facts believed to be

28

1 | necessary to establish probable cause. Dates and times are approximate, and refer to Pacific
2 | Standard Time (PST) unless otherwise specified.

3 | **II**

4 | **AFFIANT'S EXPERIENCE AND TRAINING**

5 |      6.    I am a California peace officer employed by the El Cajon Police Department
6 | (ECPD) and have been so employed for eight years. I am currently assigned to the Drug
7 | Enforcement Administration (DEA), San Diego Field Division's (SDFD), San Diego
8 | County Integrated Narcotic Task Force (NTF), Team 2, as a Task Force Officer (TFO) and
9 | have been so assigned since June of 2018. Within this assignment, I investigate drug
10 | trafficking organizations that operate here in San Diego County, as well as throughout the
11 | state of California, other states, and in Mexico. I work closely with DEA agents, federal
12 | agents, and other local and state officers that's primary responsibility is combating criminal
13 | activity related to narcotics trafficking.

14 |      7.    Prior to my current assignment, I was assigned to the following ECPD
15 | divisions and assignments; Metropolitan Division: Special Enforcement Unit;
16 | Investigations Division: Gang Suppression Team; Special Operations Unit: Gang Street
17 | Team; Patrol Division: Mall Enforcement Team; Patrol Division: Patrol Officer. In each
18 | of these assignments, I personally investigated a wide array of various crimes, including
19 | those related to narcotics.

20 |      8.    I am in charge of managing multiple confidential sources (CS) which I utilize
21 | for narcotics investigations.

22 |      9.    I have taken part in the service of over seventy-five (75) narcotics search
23 | warrants. I have personally written and served narcotics search warrants that have led to
24 | seizure of narcotics and the arrest of narcotics dealers involved in narcotics sales. As case
25 | agent on narcotic investigations I have conducted, I have utilized surveillance teams,
26 | undercover officers, confidential informants, and law enforcement personnel from other
27 | police agencies. During my time as a police officer, I have testified over twenty (20) times
28 | in court as an expert witness in cases involving the sale of narcotics.

10.   I have attended hundreds of hours of additional law enforcement training, much of which is related to narcotics and narcotics investigations. Some of the narcotics specific classes I have attended include: Informant Development and Maintenance, Confidential Informant Management and Buy Walk Operations, Methamphetamine Updates, Drug Abuse Recognition, Advanced Drug Abuse Recognition, B.H.O. Labs, Advanced Narcotics Investigations, and Dark Web (Narcotic) Investigations.

11.   I have familiarized myself with the narcotics sub-culture, common narcotics sales and trafficking techniques, methods that narcotics dealers and traffickers utilize to avoid police detection, and the common tools and electronic devices that narcotics dealers and traffickers utilize in their criminal activities to assist them in their narcotics sales and trafficking.

12.   Since serving in my current assignment as a Task Force Officer with the DEA, I have written and served multiple search warrants which have led to the combined seizure of over 1,000 pounds of controlled substances. During this same time period, I have seized over $100,000 of drug sales proceeds.

13.   I have been a member of the California Narcotics Association since 2012, possess a Bachelor's of Science in Criminal Justice Administration, and possess a Basic, Intermediate, and Advanced Certification from California P.O.S.T.

14.   As a Task Force Officer, I am authorized to investigate violations of laws of the United States and I am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

15.   By virtue of my assignment as a Task Force Officer with the DEA, I have performed various tasks which include, but are not limited to: functioning as a case agent, or co-case agent for investigations of narcotic trafficking organizations; functioning as a surveillance agent and thereby observing and recording the movements of persons suspected of narcotic trafficking; interviewing suspects, witnesses, and cooperating individuals with specific knowledge relevant to narcotics trafficking.

16.    I am familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics and the collection of money proceeds of narcotics trafficking and methods of money laundering used to conceal the nature of the proceeds. I have had training in investigations regarding the unlawful importation, possession, and distribution of controlled substances, as well as conspiracies associated with criminal narcotics violations.

17.    Through the course of my training, investigations, and conversations with other law enforcement personnel, I have learned that it is a common practice for narcotics traffickers to work in concert with other individuals and to do so by utilizing cellular telephones, pagers, and portable radios to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involved in the smuggling and trafficking of narcotics generate many types of evidence including, but not limited to, cellular phone-related evidence such as voice-mail messages referring to the arrangements of travel and payment, names, photographs, text messaging, and phone numbers of co-conspirators. Typically, narcotics trafficker transporting narcotics from one location to another are in telephonic contact with co-conspirators immediately prior to and following the transportation, at which time they receive instructions on where and when to deliver the controlled substances.

18.    Based upon my training and experience as a Task Force Officer, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a.    Drug traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b.    Drug traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

5

c.      Drug traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

d.      Drug traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e.      Drug traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f.      Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

g.      The use of cellular telephones and other mobile communication devices by conspirators or drug traffickers tends to generate evidence that is stored on the device, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

19.    Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a narcotics traffickers use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that device.

20.    Based upon my training and experience as a Task Force Officer, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data,

1  remnant data, slack space, and temporary or permanent files contained on or in the
2  cellular/mobile telephone. Specifically, based upon my training, education, and
3  experience investigating these conspiracies, I have learned that searches of cellular/mobile
4  telephones and/or other mobile communication devices yields evidence:

5          a.      tending to indicate efforts to import methamphetamine, fentanyl, or
6  other federally controlled substances from Mexico into the United States, and to distribute
7  methamphetamine, fentanyl, or other federally controlled substances within the United
8  States;

9          b.      tending to identify accounts, facilities, storage devices, and/or services
10  such as email addresses, IP addresses, and phone numbers used to facilitate the importation
11  of methamphetamine, fentanyl, or other federally controlled substances from Mexico into
12  the United States, and the distribution of methamphetamine, fentanyl, or other federally
13  controlled substances within the United States;

14          c.      tending to identify co-conspirators, criminal associates, or others
15  involved in the importation of methamphetamine, fentanyl, or other federally controlled
16  substances from Mexico into the United States, and the distribution of methamphetamine,
17  fentanyl, or other federally controlled substances within the United States;

18          d.      tending to identify travel to or presence at locations involved in the
19  importation of methamphetamine, fentanyl, or other federally controlled substances from
20  Mexico into the United States, and the distribution of methamphetamine, fentanyl, or other
21  federally controlled substances within the United States;

22          e.      tending to identify the user of, or persons with control over or access
23  to, cellular/mobile telephones; and/or

24          f.   ˙  tending to place in context, identify the creator or recipient of, or
25  establish the time of creation or receipt of communications, records, or data involved in the
26  activities described above.

27  //

28  //

7

### III

### STATEMENT OF PROBABLE CAUSE

**A.   BACKGROUND OF INVESTIGATION**

21.   On March 6, 2019, I met with a Confidential Source (CS)[1] who provided information about a narcotics trafficker known to as Cabezon. Cabezon was later identified as Efren Wilson-ONTIVEROS. During this time, the CS provided information about ONTIVEROS, and how ONTIVEROS had offered to sell the CS methamphetamine for the price of $1,300 a pound in approximately December of 2018 or January of 2019. After I received the information about ONTIVEROS, the investigation led to several controlled purchases, summarized below, and ONTIVEROS' eventual arrest on August 7, 2019.

**B.   CONTROLLED PURCHASES**

22.   On March 26, 2019, ONTIVEROS communicated with the CS during a series of text and audio messages via the cell phone application WhatsApp and coordinated the sale of one pound of methamphetamine for the price of $1,100. Later that day, uncharged defendant No. 2 (UD2) working on behalf of ONTIVEROS delivered one pound of methamphetamine to the CS and was paid $1,100. During this time, the CS told UD2, "I'm going to give these to my people to check out. If it's good, I'm going to order more." UD2 responded, "Okay, talk to Cabezon."

23.   In April 2019, ONTIVEROS offered to sell the CS 5,000 counterfeit Oxycodone "M30" (fentanyl) pills for $6 each, for a total price of $30,000. On April 26, 2019, agents attempted a controlled purchase of the fentanyl pills. However, ONTIVEROS told the CS the pills were not in San Diego. Because of this, the operation was terminated.

24.   On May 6, 2019, the CS told agents that ONTIVEROS was in Chula Vista with another male, and that the CS believed ONTIVEROS was in possession of the 5,000

---

[1] The CS began cooperating with agents on approximately May 2017. The CS is on supervised release from a 2012 conviction of importation of heroin. Since 2017, the CS has been paid approximately $100,000 for assisting law enforcement. The CS has provided reliable information because, in part, it has been corroborated by physical surveillance, records checks, text messages, call logs, and recorded conversations.

1  fentanyl pills. Based on this information, officers with the Chula Vista Police Department
2  stopped a black Cadillac. Inside the car were three occupants, uncharged defendant No. 3
3  (UD3) (driver), ONTIVEROS (front-passenger), and Luis Garcia Valdivia (rear-
4  passenger). During a search of a bag that Valdivia was observed holding, officers located
5  5,000 counterfeit oxycodone "M30" (fentanyl) pills. Valdivia was arrested on state charges
6  and UD3 and ONTIVEROS were released.

7       25.    On May 23, 2019, ONTIVEROS communicated with the CS during a series
8  of text and audio messages via the cell phone application WhatsApp and coordinated the
9  sale of two pounds of methamphetamine for the price of $2,200. Later that day, uncharged
10  defendant No. 4 (UD4), working on behalf of ONTIVEROS gave the CS two pounds of
11  methamphetamine and was paid $2,200. Upon the CS meeting with UD4 to buy the
12  methamphetamine, the CS asked, "Cabezon?" UD4 answered yes.

13  **C.    DEFENDANTS' ARREST**

14       26.    On August 5, 2019, the CS negotiated a 3,000 counterfeit Oxycodone "M30"
15  (fentanyl) pill purchase from ONTIVEROS. The agreed upon price was $6.50 a pill, for a
16  total purchase price of $19,500.[2]

17       27.    During the communication between the CS and ONTIVEROS, the CS told
18  ONTIVEROS that s/he was concerned with the pills not showing up at the agreed upon
19  location or at the agreed upon time. ONTIVEROS stated that he would be personally
20  traveling into the United States from Mexico to deliver the 3,000 pills to the CS.

21       28.    On August 6, 2019, ONTIVEROS contacted the CS via the WhatsApp
22  messaging application and informed the CS that he was going to come into the United
23  States the next morning (on August 7, 2019).

24

25

26  [2]  The communication between the CS and the Defendant took place over the cell phone
    application WhatsApp and consisted of written text messages and recorded audio
27  messages. The cellular phone numbers associated with these WhatsApp communications
    that ONTIVEROS utilized were 52 1 (664) 820-9149 and 52 1 (664) 820-2466. These text
28  and voice messages have been copied and saved by DEA personnel.

29.   On August 7, 2019, at 10:00 a.m., ONTIVEROS contacted the CS via WhatsApp and said he was about to cross into the United States. Records show that at 11:05 a.m. ONTIVEROS crossed into the United States through the Otay Mesa, Port of Entry.

30.   At approximately 11:30 a.m., ONTIVEROS contacted the CS via WhatsApp to let the CS know that they were at the trolley station off Palm Avenue in Chula Vista.

31.   At approximately 12:27 p.m., agents saw ONTIVEROS with Target Device 1 to his ear, walk away from a bus bench and into a parking lot where he made a hand gesture toward a white Smart car, registered to UD1. The car pulled into the parking lot and parked. UD1 got out of the car and met ONTIVEROS. During this meeting, ONTIVEROS passed Target Device 1 to UD1 who spoke into it. Simultaneous to this, UD1 was observed holding Target Device 2.

32.   After standing on this corner together and both speaking into Target Device 1 to a presumed third party, ONTIVEROS and UD1 separated.

33.   At approximately 12:41 p.m., agents saw UD1 walk into a Mexican food restaurant. Within a few minutes, UD1 walked out of the restaurant, now holding an empty white colored plastic bag with the words Muchas Gracias printed on it. UD1 immediately returned to her car, and drove off.

34.   At approximately 12:44 p.m., agents saw the car travel to Citrus Avenue where surveillance was briefly lost. Minutes later, agents observed ONTIVEROS emerge from a dirt lot on the north side of Citrus Avenue and cross over Hollister Street, walking on foot. At this point, ONTIVEROS was observed carrying the same white plastic bag with the words Muchas Gracias. It appeared that the plastic bag now contained an unknown rectangular item inside it. Moments later, agents saw UD1's car drive out of Citrus Avenue and onto Hollister Street.

35.   Once the suspected transfer of the 3,000 pills occurred, agents decided to arrest ONTIVEROS and UD1. Uniformed agents approached ONTIVEROS as he stood on a trolley platform at the MTS Trolley Station located at 688 Palm Avenue. As agents

1  approached, ONTIVEROS dropped the white plastic bag he was holing next to a trolley
2  ticket kiosk and then walked away from it. Agents then took ONTIVEROS into custody.
3  During the arrest of ONTIVEROS, Target Device 1 was seized from his person.
4  ONTIVEROS identified Target Device 1 as belonging to him.[3]

5      36.    The white plastic bag that ONTIVEROS dropped next to the trolley ticket
6  kiosk was immediately retrieved and found to contain a rectangular shaped package which
7  had been wrapped in black electrical tape.

8      37.    Simultaneous to ONTIVEROS being apprehended, agents stopped UD1's car.
9  Inside the car was a female (F1) riding as passenger. Both UD1 and F1 were arrested at
10  that time. During UD1's arrest, Target Device 2 was found on the driver's seat of the
11  vehicle UD1 was driving. UD1 identified Target Device 2 as belonging to her.

12      38.    Once at the station, F1 waived her *Miranda* rights and agreed to speak with
13  agents. During the interview, F1 stated that she had knowledge of UD1's being in
14  possession of the 3,000 fentanyl pills since the day prior, August 6, 2019. Additionally, F1
15  stated that UD1 worked for a drug trafficking organization that operated out of Tijuana,
16  Mexico.

17      39.    At the station, agents cut into the package and saw it was filled with blue
18  colored circular pills inscribed with "M" on one side and "30" on the other, so as to give
19  the appearance of it being the legitimate pharmaceutical drug, 30mg Oxycodone. The
20  visual estimation of the quantity of the pills was consistent with there being 3,000. A field
21  test showed that the pills contained fentanyl. The gross weight of the pills in their packaging
22  was 437.4 grams. The seized substance has been sent to the DEA Southwestern Laboratory
23  for testing. Results are pending.

24      40.    ONTIVEROS was charged by federal complaint in Case No. 19-mj-3314-
25  MDD. UD1 was arrested, booked into county jail, but eventually released. F1 was released
26  without charges.

27  _____
28  [3] At the station, ONTIVEROS gave agents the password for Target Device 1. Target Device 1 was not searched.

41.     Based on my experience investigating narcotics traffickers, ONTIVEROS and UD1 may have used the Target Devices to coordinate with other parties involved regarding the transportation and distribution of fentanyl. I believe that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites, pictures, and other digital information may be stored in the memory of the Target Devices. This data may include information that is relevant to ONTIVEROS and UD1's narcotics trafficking activities, including identifying other persons involved in their narcotics trafficking activities.

42.     Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual transportation of the controlled substances. All parties involved communicate with one another in efforts to ensure success in getting their valuable cargo to its intended destinations and buyers. Accordingly, probable cause exists to believe that evidence of the aforementioned offenses exists on the Target Devices for the period of December 1, 2018 to August 7, 2019.

**IV**

**METHODOLOGY**

43.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive

12

1  equivalents and store information in volatile memory within the device or in memory cards
2  inserted into the device. Current technology provides some solutions for acquiring some of
3  the data stored in some cellular telephone models using forensic hardware and software.
4  Even if some of the stored information on the device may be acquired forensically, not all
5  of the data subject to seizure may be so acquired. For devices that are not subject to forensic
6  data acquisition or that have potentially relevant data stored that is not subject to such
7  acquisition, the examiner must inspect the device manually and record the process and the
8  results using digital photography. This process is time and labor intensive and may take
9  weeks or longer.

10      44.   Following the issuance of this warrant, I will collect the Target Devices and
11  subject them to analysis. All forensic analysis of the data contained within the Target
12  Devices and memory card(s) will employ search protocols directed exclusively to the
13  identification and extraction of data within the scope of this warrant.

14      45.   Based on the foregoing, identifying and extracting data subject to seizure
15  pursuant to this warrant may require a range of data analysis techniques, including manual
16  review, and, consequently, may take weeks or months. The personnel conducting the
17  identification and extraction of data will complete the analysis within ninety (90) days of
18  the date the warrant is signed, absent further application to this court.

19                                  **V**
20                          **CONCLUSION**

21      46.   Based on all of the facts and circumstances described above, my training and
22  experience, and consultations with other law enforcement officers, there is probable cause
23  to conclude that ONTIVEROS and UD1 utilized the Target Devices to facilitate the
24  commission of the Target Offenses.

25      47.   Further, based on the CS statements that the defendant offered to sell him
26  methamphetamine in approximately December of 2018 or January of 2019, probable cause
27  exists to believe that evidence of the aforementioned offenses exists on the Target Devices
28  for the period of December 1, 2018 to August 7, 2019.

48.     Because the Target Devices were promptly seized during the investigation of Defendant's drug trafficking activities and has been securely stored, there is probable cause to believe that evidence of illegal activity committed by ONTIVEROS and UD1 continues to exist on the Target Devices.

49.     Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I believe that the items to be seized set forth in Attachments B-1 and B-2 (incorporated herein) are likely to be found in the property to be searched described in Attachments A-1 and A-2 (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachments A-1 and A-2, and seize the items listed in Attachments B-1 and B2.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Task Force Officer Ian Crawford
DEA - Narcotic Task Force

Sworn to and subscribed before me this _29th_ day of August, 2019.

HON. ANDREW G. SCHOPLER
UNITED STATES MAGISTRATE JUDGE

14